Filed 3/29/13  Sharp v. Paul CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PRESTON SHARP, | B242280 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GS013993) |
| v. | |
| DEBORAH PAUL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge.  Reversed.

Caldwell Leslie & Proctor, Andrew A. Esbenshade and Jeffrey M. Chemerinsky for Defendant and Appellant.

Preston Sharp, in pro. per., for Plaintiff and Respondent.

\* \* \* \* \* \* \*

Respondent Preston Sharp lived in a house owned by appellant Deborah Paul. He lived rent free with the understanding he would oversee substantial repairs to the residence. When Paul no longer wanted Sharp's services, she asked him to move out of the residence.

As a result of conduct not relevant to the current appeal, Paul successfully sought a restraining order against Sharp. Sharp simultaneously successfully sought a restraining order against Paul. On appeal, Paul challenges the sufficiency of the evidence to support the restraining order entered against her. Because we conclude the restraining order is not supported by substantial evidence, we reverse and dissolve it.

## FACTUAL BACKGROUND

In his request for a civil harassment order, Sharp described Paul's harassment as follows: "She was having me physically removed by her 'family' since sent harassing texts till 3-5-12." (*Sic.*) "3-1-12 told neighbors." "On January 23rd she came to the jobsite/my residence and pointed a 357 magnum directly at my face from appx. 18 [inches]. Her partime [*sic*] boyfriend . . . was standing behind her. She has made it clear this individual hates me, has terminated my employment, and harassed me since." Sharp described Paul's harassment as constant since February 22, 2012.

At a hearing, Sharp attempted to specify the harassment but had some difficulty describing Paul's harassing behavior.[1] Sharp explained he was fearful when Paul forgot things and believed she may have suffered from "disingenuous disremembering." Sharp was upset by the reasons Paul gave for terminating his employment, which Sharp described as incorrect hearsay statements. Sharp believed it was "harassment to cover up [Paul] fired [him] because her feelings were hurt." Sharp was concerned Paul hit her mailbox when driving away from the house and considered that conduct harassing. Sharp

---

[1]     The trial court repeatedly asked Sharp to specify the alleged harassment. The court stated, "Let me stop you for a moment. What is the harassment?" "What are you saying was the harassment?" "Okay. So she said something negative to the neighbor." "I'm trying to understand what the harassment is." "I understand you disagree with what she said. You also filed a petition, and . . . I want to understand the basis for that." "I'm trying to understand what you're saying is the harassment."

was upset that Paul told a neighbor Sharp was "acting weird," and her family would need to "physically remove him." Sharp was upset because Paul downplayed Sharp's relationship with Paul's daughter. Paul's statement that Sharp was homeless further upset Sharp. Paul called Sharp's sister, an act Sharp found to be harassing. According to Sharp, Paul suffered from mental conditions that caused Sharp concern. And, Sharp was distressed because Paul "showed . . . neglect" when Sharp "was injured."

With respect to the gun incident described in Sharp's petition, Paul explained she purchased a home with its contents included. Inside the home, she found three handguns. Paul knew Sharp was familiar with guns and asked him to look at the guns, which Sharp agreed to do. Paul showed two of the unloaded guns to Sharp, and Sharp handled the guns expressing an interest in one and advising Paul of their value. Paul testified she did not point the gun at Sharp. Paul's boyfriend, who was present, recounted the incident, stating that no one pointed a gun at Sharp or threatened Sharp in any manner. Instead, Sharp agreed to look at the guns, handled them, and was excited by one of them.

Sharp's account of the incident was mostly consistent with Paul's. Sharp knew Paul was bringing the guns to show him. The only discrepancy between Sharp's and Paul's account was that Sharp stated Paul pointed the unloaded weapon at him. Sharp testified Paul pointed a gun at him, but he knew "she just didn't mean anything by it . . . ." "She didn't point it at me and say I'm going to shoot you or anything like that. . . . She pointed it at my face [a]nd every adult knows you never, never point a weapon at anyone. I [(Sharp)] overreacted then." Sharp reiterated that Paul did not say anything threatening. Sharp also acknowledged he handled the guns after Paul pointed one at him.

On April 18, 2012, the trial court entered a civil harassment restraining order requiring Paul to stay 100 yards away from Sharp. The order also prohibited Paul from harassing Sharp or contacting Sharp. This appeal followed.

## DISCUSSION

Code of Civil Procedure section 527.6 (section 527.6) permits issuance of a restraining order if a person suffers harassment. For purposes of this statute, harassment

3

is limited to "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (*Id.*, subd. (b)(3).) "Course of conduct" in turn is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer email. . . ." (*Id.*, subd. (b)(1).)

The element of emotional distress necessary under section 527.6 is analogous to the tort of intentional infliction of emotional distress and requires "highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.' [Citations.]" (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762-763.) "'Conduct, to be "'outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259 (*Huntingdon Life Sciences*).)

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.]" (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) "An injunction is authorized only when it appears that wrongful acts are likely to recur." (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402 (*Russell*).) It is not based on redress for past acts. (*Id.* at p. 403.) Importantly, a single act of violence is insufficient to support an injunction unless that single act demonstrates that "future harm is highly probable." (*Id.* at p. 404.)

A court must determine by clear and convincing evidence that an injunction is warranted. (*Russell, supra*, 112 Cal.App.4th at p. 401.) We review the trial court's

4

factual findings to determine whether they were supported by substantial evidence. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.) Whether the facts construed in support of the injunction are sufficient to constitute civil harassment is a question of law subject to de novo review. (*Ibid.*) As we explain, the facts construed in the light most favorable to the injunction do not support it.

There was no evidence of "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(3).) Putting aside for the moment Sharp's testimony that Paul pointed a firearm at him, no other event described by Sharp was sufficient singularly or in combination to support the restraining order. While the conduct may have been distressing to Sharp, it did not fall within the definition of harassment in section 527.6. Conduct distressing to Sharp is not the appropriate standard. (*Schild v. Rubin, supra*, 232 Cal.App.3d at p. 764 ["""The question is not whether the plaintiffs have been annoyed or disturbed . . . but whether there has been an injury to their legal rights.""""].) Not only did Sharp fail to identify harassing conduct, he failed to identify a "course of conduct" that would "cause a reasonable person to suffer substantial emotional distress." (§ 527.6, subd. (b)(3).) Paul's memory loss, termination of Sharp, anger at Sharp, as well as the other conduct described by Sharp was not so outrageous or "'so extreme as to exceed all bounds of that usually tolerated in a civilized society.' [Citation.]" (*Huntingdon Life Sciences, supra,* 129 Cal.App.4th at p. 1259.)

Turning to the firearm incident, "'[c]ontext is everything in threat jurisprudence.' [Citation.]" (*Huntingdon Life Sciences, supra*, 129 Cal.App.4th at p. 1250.) Here, although Sharp testified Paul pointed a gun directly at him, the context undisputedly demonstrated that Paul's pointing a gun at Sharp was not a threat. It was undisputed Paul showed Sharp the firearms to obtain his assistance in valuing them, not to threaten Sharp. Significantly, Sharp admitted he did not feel threatened. Sharp testified Paul did not intend to threaten him when she pointed the gun at him. He knew "she didn't mean anything by it." Instead, according him, she did not know how to handle guns. Under

5

such circumstances, the conduct would not cause a reasonable person to suffer substantial emotional distress, and it did not cause Sharp to suffer substantial emotional distress or to fear for his safety within the meaning of the statute.  In this peculiar context, pointing an unloaded gun at Sharp did not constitute a credible threat of violence or harassment.**2** Because no substantial evidence supports the restraining order, it must be reversed.

## DISPOSITION

The order is reversed.  The injunction is dissolved.  Appellant is entitled to costs on appeal.


FLIER, Acting P. J.



We concur:


GRIMES, J.


KARLAN, J.*

---

**2**     Additionally, there was no evidence that Paul's conduct in pointing a firearm at Sharp was likely to recur.  Not only had Paul turned in the weapons prior to the hearing on the restraining order, but it was undisputed that prior to this incident she "never owned or even touched a gun," and there was no evidence she ever threatened Sharp with a weapon.

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.